# UNITED STATES DISTRICT COURT

for the

District of New Mexico

**FILED**

United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

1116 N. AVE. K, PORTALES, NEW MEXICO 88130

)
)
)
)
)
)

Case No.  MR 25-296

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ District of _____New Mexico_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 846 | Conspiracy |
| 18 U.S.C. 922(g) | Felon in possession of a firearm and ammunition |

The application is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Chandler Rule, DEA Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
___telephonically sworn and electronically signed___ *(specify reliable electronic means).*

Date:  __2/19/2025__

_____
*Judge's signature*

City and state:  __Albuquerque, New Mexico__

The Hon. Jennifer Rozzoni, U.S. Magistrate Judge
_____
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

IN THE MATTER OF THE SEARCH OF:
1116 N. AVE. K, PORTALES, NEW MEXICO
88130

Case No. _____

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Chandler Rule, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules
of Criminal Procedure for a warrant to search the premises known as 1116 N. Ave. K, Portales,
New Mexico 88130, hereinafter "PREMISES," further described in Attachment A, for the things
described in Attachment B.

2.      My experience as a narcotics agent includes, but is not limited to: conducting
physical surveillance, interviewing witnesses, writing affidavits for and executing search warrants,
working with undercover agents and informants, issuance of administrative and federal grand jury
subpoenas, analysis of phone toll and financial records, and analysis of data derived from the use
of pen registers and trap and traces.

3.      Through my training, education, and experience, I have become familiar with the
manner in which drug trafficking organizations operate, and know that cellular telephone location
data can be useful in locating members of an organization when other investigative methods have
failed.  By locating members of an organization, particularly at times when they are engaged in

illegal activity, agents are able to further their investigation and gather additional evidence of drug trafficking crimes.

4.    I have been involved in an ongoing investigation regarding the distribution of controlled substances in violation of 21 U.S.C. § 846, specifically methamphetamine and fentanyl, in and around Clovis and Portales, New Mexico.  I, as well as other Special Agents and Task Force Officers with the DEA, and law enforcement officials from other agencies have obtained information regarding the illegal drug trafficking activities of Miguel Flores ("Flores") and others (the "SUBJECTS").

5.    I make this affidavit based upon my own personal knowledge, which is substantially derived from my participation in the investigation, as well as that of fellow agents and officers who have participated in the investigation.  In addition, I have developed information I believe to be reliable from additional sources including:

   a.    Information provided by Task Force Officers ("TFO"), Special Agents ("SA"), and Intelligence Research Specialists (IRS) of the DEA, and other law enforcement officials ("agents"), including oral and written reports that I have received directly or indirectly from said investigators;

   b.    Results of physical surveillance conducted by agents during the investigation;

   c.    A review of telephone toll records and subscriber information;

   d.    Information derived from consensually recorded conversations;

e.      A review of driver's license and automobile registration records;

f.      Records from commercial databases; and

g.      Records from the National Crime Information Center ("NCIC").

6.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

<u>FEDERAL CHARGES RELEVANT TO THIS INVESTIGATION</u>

7.      I believe there is probable cause that the SUBJECTS have committed, are committing, and will continue to commit offenses involving violations of:

a.      21 U.S.C. § 846 – Conspiracy to distribute and possess with intent to distribute controlled substances; and

b.      18 U.S.C. § 922(g) – Felon in possession of a firearm.

<u>EVIDENCE SOUGHT DURING SEARCH</u>

8.      Based on my training, experience and participation in this and in similar investigations, I believe that individuals involved in illegal trafficking of controlled substances often conceal evidence of their drug trafficking activities in their residences and businesses, or the residences of friends or relatives, and in surrounding areas to which they have ready access such as garages, carports and outbuildings. They also conceal evidence in vehicles, including vehicles outside of their residences and businesses, so that they have ready access to it and so that they can hide it from law enforcement, including law enforcement officers executing search warrants at their residences or businesses. Evidence also may be found in other areas to which a drug dealer has ready access, such as rented storage areas and safety deposit boxes, or buried underground on

3

their property.  This evidence, which is discussed in detail in the following paragraphs, includes controlled substances, paraphernalia for weighing, packaging and distributing controlled substances, other contraband, records, documents, as well as evidence of drug transactions, proceeds from drug sales, and valuables obtained from proceeds.

9.      Individuals involved in illegal drug trafficking of controlled substances often keep quantities of controlled substances on their person, in their residences, garages, outbuildings, storage areas, carports and yards, in their businesses, in the residences of friends or relatives, in their vehicles, in off-site storage facilities, and in other areas to which they have ready access.

10.     Individuals involved in drug dealing commonly use certain paraphernalia to package and prepare controlled substances for distribution.  The paraphernalia includes, but is not limited to, packaging materials (such as plastic baggies, wrapping paper, cellophane, condoms, and film canisters) and scales to weigh controlled substances.  Drug dealers commonly store these items on their person, in their residences, in their businesses, in their residences of friends or relatives, in their vehicles, and in other areas to which they have ready access.

11.     Drug traffickers often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses.  Even after the drugs are sold, documentary records are often maintained for long periods of time, even years, to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and co-conspirators.  These records may be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay/owe sheets, IOUs,

miscellaneous notes, money orders, customer lists, and telephone address books. These records can reflect names, addresses and/or telephone numbers of associates and co-conspirators, the sale and purchase of controlled substances including precursors, customer lists, and amounts of money owed to the trafficker by customers and by the trafficker to his/her suppliers.

12.    Drug traffickers often travel domestically and internationally to facilitate their trafficking. Evidence of foreign and domestic travel by persons engaged in illegal drug trafficking includes travel itineraries, airline tickets, receipts, passports, and visas. These items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of relatives and in cars. Many of these items are accessible via the internet and can be downloaded and saved on the computer or other digital media and on storage media.

13.    Drug traffickers often use storage facilities for drugs and other items related to trafficking that are at a location away from their residences and businesses. These off-site storage facilities are often commercial storage lockers and rooms. These locations are often used to store or hide drugs, contraband, money and other valuables. Drug traffickers often keep documents and other items tending to show the existence of other stored drugs, contraband, money and other valuables in areas such as storage facilities. Those documents and other items include rental agreements, receipts, keys, notes and maps specifically concerning off-site storage rooms, lockers, and safety deposit boxes. This evidence may be found on their person or in their businesses, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or

5

relatives, and cars. This type of documentation can be stored on digital media and concealed virtually anywhere.

14. Other evidence of transportation, ordering, possession and sale of drugs can include the following: telephone bills to show numbers called by the drug dealers (and hence potential associates), overnight mail receipts, bank statements, deposit and withdrawal slips, savings books, investment statements, loan statements, other financial institution statements, and federal and state tax returns. The above items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars. This type of documentation can be stored on digital media and concealed virtually anywhere.

15. Drug traffickers usually sell their product for cash. Because large quantities of drugs can sell for thousands of dollars at the wholesale level, dealers may have thousands of dollars in cash on hand both as proceeds of sales and to purchase supplies/inventory. In addition, drug dealers often have other assets generated by their drug business, or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles, and other valuables.

16. Individuals involved in drug dealing often try to legitimize these profits from the sale of drugs. To accomplish this goal, drug traffickers may utilize foreign and/or domestic banking institutions and their attendant services, real estate and businesses, both real and fictitious. They also try to secret, transfer and conceal the money by (a) placing assets in names other than their own to avoid detection while maintaining control, (b) laundering money through what

appears to be a legitimate business or businesses, (c) hiding the money in their homes, safes and safety deposit boxes, and/or (d) using the money to buy assets which are difficult to trace. This evidence is useful in a criminal prosecution, and it also is useful in identifying real and personal property that can be seized and forfeited by the government under existing laws. Documentation concerning this type of activity can be stored on digital media and concealed virtually anywhere.

17.     Evidence of significant, unexplained income of drug dealers, or for the acquisition and concealment of money and assets of drug sales, can be found on banking and investment account statements, credit card account statements, canceled checks, money orders, deposit slips, check and savings books, business and personal ledgers, accounting records, safe deposit box records and keys, federal and state tax records, rental receipts, rental agreements, utility bills, overnight mail receipts, telephone bills, loan statements records reflecting ownership of real or personal property (such as deeds of trust or vehicle registration, insurance, and ownership information), vehicle and property rental records, lease and purchase agreements, and canceled mail. These records can be maintained on paper, but also can be maintained as electronic data on computers and other digital media. The above items are typically kept by drug dealers on their person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and vehicles.

18.     The use of digital media, including smartphones, tablets, cellular phones, and digital devices, has become part of everyday life. This is also true for drug traffickers. Information stored in electronic form on all of the above-devices can provide evidence of drug trafficking.

7

Drug traffickers frequently use some or all of these devices to communicate with co-conspirators, customers, sources of supply, and others involved in the drug trade. These communications include, but are not limited to, phone calls, text messages, SMS (Short Message Service) messaging, MMS (Multimedia Messaging Service) messaging, social media posts and messaging, and smartphone application messaging services. Smartphones, tablets, cellular phones, and digital devices are frequently capable of storing messages, emails, social media communications, and communications made over smartphone applications. The content of these communications will often provide evidence of drug trafficking. Numbers stored on a telephone (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the drug dealer is calling, and thus the identity of potential associates.

19.     Drug traffickers often take, or cause to be taken, photographs and/or videos of themselves, their associates, their property and their drugs.  They usually maintain these photographs and/or videos on their person or in their businesses, residences or cars, on computers, or in the residences of friends or relatives.  Smartphones, tablets, cellular phones, digital cameras, and other digital devices, often have the capability to take still photos and videos and save them indefinitely on the device's storage medium. Drug traffickers frequently use these devices to take their photographs and videos.

20.     Drug traffickers often maintain firearms and ammunition on their person or in their homes, businesses or cars to protect themselves and their drugs and their drug profits.  They also

may maintain indicia of firearms such as receipts for firearms and ammunition, boxes for firearms and ammunition, firearms cleaning supplies, and instruction manuals and other documentation for firearms and ammunition.

21.     I know that weapons (including rifles, shotguns, and handguns) are tools of the trade for drug traffickers, who often keep firearms in close proximity to themselves, and their product and proceeds, to protect them from other drug traffickers and law enforcement.

22.     Drug traffickers often conceal evidence of drug dealing in vehicles outside of their residences for ready access and to prevent detection and seizure by officers executing search warrants at their residences.  This evidence, which is discussed in detail in the preceding paragraphs, includes controlled substances, indicia such as packing documents and electronic storage devices (and their contents,) evidence tending to show the distribution of drugs (such as IOUs, pay-owe sheets, ledgers, lists of names and numbers, telephone address books, etc.), digital devices such as cellular/mobile/smart telephones and tablets (and their contents), and counter-surveillance devices.

23.     Drug traffickers often utilize digital video surveillance systems. A digital video surveillance system is a surveillance system that is capable of capturing images, videos, and audio that can be compressed, stored or sent over communication networks. I know that it is common for digital surveillance systems to contain storage media that allow for 30 days or more of camera footage to be stored on the system. Digital video surveillance systems can be used for nearly any environment, including a commercial business or residence. I know that drug traffickers make use

9

of video surveillance systems to monitor who is approaching their residence and assess whether the person presents a threat to the trafficker's drugs or drug proceeds. Drug traffickers also utilize surveillance equipment to obtain advance notice when law enforcement arrives to hide or destroy evidence of criminal activity. However, given the constant recording that occurs with a digital surveillance system, it is also common that the digital video surveillance system will also depict evidence of the residents' drug trafficking activities and conversations related to drug trafficking.

24.     Documents showing who owns, occupies, or controls the location being searched also show who is responsible for the items found on the premises, including contraband and other evidence seized.  Documents and items showing the identity of the persons owning, residing in or controlling the area being searched include, but are not limited to, utility and telephone bills, canceled envelopes and correspondence, outgoing answering machine messages, tax returns, keys, deeds and mortgage receipts.  These documents may also be produced on computers, downloaded from online accounts or scanned into digital format and stored on computers and related digital media.

25.     The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware. The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.  The term "storage media" includes any physical

object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium. Collectively, the terms "computer," "digital media," and "storage media" are referred to as "electronic media."

26.    A list of items agents seek authority to seize is in Attachment B.

## ELECTRONIC MEDIA AND FORENSIC ANALYSIS

27.    As described above and in Attachment B, this application seeks permission to search for evidence and records that might be found on the PREMISES, in whatever form they are found.  Much of the evidence and records described in the paragraphs above, and in Attachment B, can also be produced and/or stored on electronic media.  For this reason, I submit that if a computer, digital medium, or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer, digital medium, or storage medium. Thus, the warrant applied for would authorize the seizure of electronic media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

28.    *Necessity of seizing or copying entire electronic media.*  In most cases, a thorough search of a premises for information that might be stored on electronic media often requires the seizure of the physical electronic media and later off-site review consistent with the warrant. In lieu of removing electronic media from the premises, it is sometimes possible to make an image copy of electronic media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the

electronic media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

    a.  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. Electronic media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

    b.  Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the electronic media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.  Variety of forms of electronic media.  Records sought under this warrant could be
stored in a variety of electronic media formats that may require off-site reviewing
with specialized forensic tools.

29.  *Nature of examination.*  Based on the foregoing, and consistent with Rule
41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying
electronic media that reasonably appear to contain some or all of the evidence described in the
warrant, and would authorize a later review of the media or information consistent with the
warrant.  The later review may require techniques, including but not limited to computer-assisted
scans of the computer or entire medium, that might expose many parts of a hard drive to human
inspection in order to determine whether it is evidence described by the warrant.

30.  The warrant I am applying for would permit law enforcement to obtain from certain
individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or
facial characteristics) in order to unlock devices subject to search and seizure pursuant to this
warrant.  I seek this authority based on the following:

a.  I know from my training and experience, as well as from information found in
publicly available materials published by device manufacturers, that many
electronic devices, particularly newer mobile devices and laptops, offer their users
the ability to unlock the device through biometric features in lieu of a numeric or
alphanumeric passcode or password. These biometric features include fingerprint
scanners and facial recognition features. Some devices offer a combination of these

biometric features, and the user of such devices can select which features they would like to utilize.

b.  If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.  If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID."  During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

14

d.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e.  As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a

15

fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g.  In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the PREMISES and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

h.  Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using

16

one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the PREMISES and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## PROBABLE CAUSE

31.     Law enforcement officers and DEA Special Agents (collectively, "agents") are currently investigating the SUBJECTS related to a conspiracy to distribute methamphetamine, in violation of 21 U.S.C. § 846.  The SUBJECTS are part of a Drug Trafficking Organization ("DTO") run by Francisco Badillo-Montano, who coordinates deliveries of methamphetamine from Sinaloa, Mexico.

**A.  Jail Call**

32.     On December 6, 2023, agents executed a search warrant at a residence belonging to a methamphetamine distributor named Alberto Garcia.  They located 2.2 gross kilograms of methamphetamine inside a bedroom.  They also found four firearms, a scale, a money counter, and mail addressed to Garcia.  Garcia was arrested elsewhere and detained at the Cibola County Correctional Center, where his calls were recorded.

17

33.     On January 4, 2024, Garcia[1] called "Bucky" at 575-219-0667.  Agents have identified "Bucky" as Miguel Flores, a drug trafficker based in Portales, New Mexico.[2]

34.     Garcia quickly apologized for calling Flores "from here," i.e. on a recorded line, and explained that he had been trying to have his "baby mama" call Flores instead.  The pair then engaged in a suspicious conversation:

| | |
|---|---|
| Garcia: | I'm . . . just waiting on . . . on this home material bro.  I was going to get.  I was going to see if you still wanted your home repaired." |
| Flores: | If I still wanted my home what? |
| Garcia: | If you still wanted your home repaired?  I was about to get some material like the floor and and windows and all that |
| Flores: | Yeah…um… |
| Garcia: | If you know what I mean |
| Flores: | Yeah I just replace all the windows; I need some doors. |
| Garcia: | Yeah yeah I got you bro.  um. |
| Flores: | Oh! It's Angel! |

_____

[1] Garcia referred to himself as "Angel," but identified himself as both "Alberto Garcia" and "Angel" during other calls.  Agents also obtained copies of the calls through a request for Alberto Garcia's recorded calls.

[2] The number Garcia called, 575-219-0667, is subscribed to Miguel Flores.  Although the subscriber address is listed as 1100 W Juniper in Portales, NM, that address is a two-minute walk from the PREMISES.  Further, the number is in frequent contact with Francisco Badillo-Montano, the head of the drug trafficking organization.

18

| | |
|---|---|
| Garcia: | Yeah it's Angel bro |
| Flores: | Oh, OK. . . . I could not figure out who you were for a second bro.  Yeah, I need to fix my doors in my car bro bad, in my house bad. |
| Garcia: | Yeah dude I was just calling to make sure I still had the job . . .  I'm just waiting on like Lowe's hardware that the shipping is taking longer than I thought.   But whenever I got it bro, I'll have my cousin or my tio somebody see you.  You know they'll be the handy man and they'll help you out. |

. . .

| | |
|---|---|
| Garcia: | It's a long story man.  There's this fucking old dude.  They found the address on his phone and that's how they hit my uncle's spot.  But I wasn't even there bro. You know?  Remember that morning I called you?  I was going to leave town bro, but as soon as I got to my baby mama's house and and and over here in Texico, they were already waiting for me bro.  Like it was a real life manhunt dude.  It's just crazy to have the whole SWAT outside and everything bro. |

. . .

| | |
|---|---|
| Garcia: | They don't have a lot on me, you know, it's just uh supposedly it's federal because they found toys[3] and then they found this and that, but nothing actually has my prints bro, I'm pretty sure of it too. |

. . .

| | |
|---|---|
| Garcia: | But uh no, I got you bro.  You know, everything's going to be the same.  . . . I'm hoping umm fucking hopefully this Saturday bro.  Saturday or Sunday, you know. Umm I have, I have all that material and stuff. |

35.     Based on my training and experience, Garcia proposed to continue to supply Flores

with  methamphetamine  during  this  conversation.    "Windows"  is  a  common  code  word  for

---

3 "Toys" is a common code word for firearms.

methamphetamine among drug traffickers.  Although this part of the conversation could, in theory, refer to a legitimate construction job, Flores appears to have no idea what Garcia is talking about until he repeats it several times.  Further, Flores has no known legitimate employment connection with Garcia.[4]  Flores appears to agree that he needs Garcia to supply him with narcotics, albeit through another party (given that Garcia is incarcerated).

**B.  Early Reports from CS-2**

36.     On February 6, 2024, agents received information from CS-2.[5]  CS-2 reported that he/she had heard that Flores was a trafficker in Portales selling pound quantities of methamphetamine.

37.     In mid-May 2024, CS-2 visited the PREMISES.  CS-2 saw Flores walking out from the back room with a couple of pounds of what he believed to be methamphetamine.

38.     In late May 2024, CS-2 spoke with another individual.  The other man bragged that he was transporting methamphetamine from Clovis to Portales for Flores.

---

[4] In 2017, Flores pled guilty to drug trafficking in state district court.  *See* D-0911-CR-201600068.  He was placed on probation, where he had several 2022 positive tests for methamphetamine before he was successfully discharged on May 23, 2023.

[5] CS-2 is cooperating with law enforcement solely in exchange for monetary gain. To date, CS-2 has been compensated $27,290. CS-2 is aware that false or misleading information would result in non-payment and possible criminal charges. CS-2 has been arrested for armed robbery, concealing identity, battery, trafficking controlled substance, abuse of a child, false imprisonment, aggravated battery, aggravated assault, larceny, robbery, violation of probation, possession of marijuana, possession of a controlled substance, evading arrest, unlawful possession of a firearm, and criminal mischief. CS-2 self-reported using a controlled substance on June 9, 2023. Agents have corroborated CS-2's information using Title III intercepts, other confidential source reporting, toll analyses, and other methods.

**C.  July Traffic Stop**

39.     In early July, 2024, a Trooper with the Arizona Department of Public Safety performed a traffic stop on a source of information ("CS-3").  A probable cause search of CS-3's vehicle produced approximately 14 pounds of methamphetamine and 2.5 pounds of fentanyl pills. Following his arrest, CS-3 informed officers that he was transporting drugs for his "uncle" to Clovis, New Mexico.[6]

40.     Agents later identified Flores as CS-3's cousin.  I know, based on my training and experience, that drug traffickers often refer to close friends or relatives as their "uncles."

41.     Agents also examined CS-3's mobile phone, and confirmed that CS-3 and Flores were communicating prior to the stop.

**D.  July 10 Surveillance**

42.     On July 10, 2024, law enforcement officers conducted surveillance near the PREMISES.  They observed that the building has stucco siding and is surrounded by a chain link fence.  There were multiple surveillance cameras fixed to the outside of the PREMISES, which is often a common tactic drug traffickers use to prevent robbery, given that they keep large amounts

---

[6] CS-2's earlier report of a man transporting methamphetamine from Clovis to Portales would be consistent with this account.  Clovis is a larger market for methamphetamine, so it could make sense for a Portales-based distributor to first move product through Clovis.  Clovis is also on the way to Portales coming from I-40, which is the primary route for trafficking from Phoenix, Arizona.

of cash.  In the driveway of the PREMISES, officers observed a gray Ford Explorer registered to Miguel Flores.

43.    Agents examined tax records for the neighborhood surrounding the PREMISES. These records identified Miguel Flores as the owner of the property.

**E.  July 11 Report from CS-2**

44.    On July 11, 2024, CS-2 reported that he/she heard, through others, that Flores continued to sell methamphetamine from the PREMISES.  CS-2 again reported that he/she had seen multiple pounds of methamphetamine at the PREMISES.  CS-2 added that Flores is usually armed with a pistol, and that Flores has a large dog at the house that is very protective.

**F.  Search Warrant at PREMISES**

45.    On July 29, 2024, agents obtained a search warrant for the PREMISES. During the execution of the search warrant, agents located Flores inside the master bedroom of the PREMISES. Agents also located a Raven Arms MP-25 handgun in the living room, a magazine with six rounds of 25 auto ammunition belonging to the MP-25, 45 9mm rounds, and approximately .9 grams of methamphetamine.

46.    Flores is a convicted felon and is prohibited from possessing firearms.

**G.  February 11, 2025 Indictment**

47.    On February 11, 2025, a District of New Mexico grand jury returned an indictment against Flores, charging him with conspiracy and felon in possession of a firearm and ammunition. An arrest warrant issued for Flores the same day.

**H. Attempted Arrest of Flores**

48.     On February 18, 2025, agents observed Flores driving a grey Ford Explorer and arrive at the PREMISES.  Flores was observed entering the PREMISES.

49.     On February 19, 2025, at approximately 6:00 a.m., agents observed the Ford Explorer at the PREMISES. Due to prior surveillance, the time of day, the knowledge of the PREMISES being Flores primary residence, and Flores' vehicle being parked in the driveway, agents believed Flores was inside the PREMISES.

50.     Agents then approached the PREMISES, announced their presence, and then entered the residence in the attempt to arrest Flores. While searching the residence for Flores, agents observed marijuana inside the master bedroom. Agents also observed what appeared to be a lever action rifle[7] and a firearms case underneath a bed in a second bedroom.  Flores was not located inside his residence.

51.     Agents now seek permission to search the residence to recover the firearms under Flores's bed, as well as to locate additional evidence of drug trafficking and related firearms possession.

_____

[7] Agents seized the rifle under the plain view doctrine.  It ultimately turned out to be a pellet gun, but there were additional firearms cases/paraphernalia under the bed.

## <u>CONCLUSION</u>

52.    I submit that this affidavit supports probable cause for a warrant to search the

PREMISES described in Attachment A and seize the items described in Attachment B.

Respectfully submitted,

Chandler Rule
Special Agent
Drug Enforcement Administration

Electronically signed and telephonically sworn
on February 19, 2025:

JENNIFER M. ROZZONI
UNITED STATES MAGISTRATE JUDGE

24

## ATTACHMENT A

*Property to be searched*

The property to be searched is 1116 N. AVE. K, PORTALES, NEW MEXICO 88130, hereinafter "PREMISES," further described as a tan stucco house surrounded by a chain-link fence. A photograph of the PREMISES appears below.



The search of the above PREMISES shall include the search of the entire residence, all attached and unattached garages and storage areas/containers (including mailboxes and trash cans) on the PREMISES. The search shall also include all vehicles parked at, or in front of, the PREMISES that have an apparent connection to the PREMISES and/or the SUBJECTS. Connection to the vehicle may be established by evidence that anyone residing at the PREMISES and/or the SUBJECTS own, operate, and/or have access to any vehicle parked at or in front of the PREMISES. Evidence includes prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

## ATTACHMENT B

*Property to be seized*

All records, information, and evidence relating to violations of 21 U.S.C. § 846 and 18 U.S.C. § 922(g), those violations involving Miguel Flores and occurring after July 29, 2024, including:

1. Controlled substances, including, but not limited to, methamphetamine, heroin, cocaine, and marijuana.

2. Drug paraphernalia, including but not limited to, scales, packaging materials, items for packaging and handling drugs.

3. Large amounts of currency, financial instruments, precious metals, jewelry and other items of value and/or proceeds of drug transactions.

4. Any and all drug customer lists, drug records, dealers lists, or any notes containing the individual names of such persons, telephone numbers, addresses of these customers or dealers, and any corresponding records of accounts receivable, money paid or received, drugs supplied or received, or cash received to pay for controlled substances or intended to pay for controlled substances.

5. Telephone and address books or notes containing telephone numbers and addresses of co-conspirators.

6. Telephone toll records for homes and/or businesses owned or controlled by suspected co-conspirators, or other communication devices used by them and/or their drug trafficking associates.

7. Messages, notes, correspondence, and/or communications between drug trafficking associates.

8. Indications of ownership or control of said premises and/or other premises used in unlawful drug trafficking activity, including but not limited to, utility bills, cancelled checks, or envelopes and deeds or leases.

9. Indications of ownership or control over any vehicles located at the place to be searched, including but not limited to, titles, registrations, gas receipts, repair bills and keys belonging to that vehicle.

10. Records, receipts, bank statements and records, money drafts, letters of credit, money orders and cashier's checks received, passbooks, bank checks, safe deposit box keys, vault keys, safes and other items evidencing the obtaining, secreting and/or concealment, and or expenditures of money.

11. Any and all financial or other instruments evidencing placement of assets in the names other than the names of the drug traffickers themselves.

12. Books, records, receipts, diaries, notes, ledgers, airline tickets, cashier's checks, money orders and other papers relating to the transportation, ordering, sale and distribution of controlled substances and the outstanding debts and collections from controlled substances that have been distributed.

13. Photographs or videos of the drug traffickers, their co-conspirators and the property and assets purchased with drug proceeds.

14. Other financial records, which may include airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel.

2

15. Firearms and ammunition, including but not limited to handguns, rifles, shotguns and automatic weapons.

16. Digital video surveillance systems, including the associated storage media.

17. Any and all computers, digital media, and storage media that reasonably appear to contain some or all of the records, information, and/or evidence described in Attachment B.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer, digital media, or storage media; any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.

The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware.

This warrant authorizes a review of all electronic media seized pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The warrant also authorizes a review of all electronic media for evidence of who used, owned, or controlled the

3

electronic media at the time the things described in this warrant were created, edited, or deleted. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, law enforcement may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

During the execution of the search of the PREMISES described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any individual who is found at the PREMISES and reasonably believed by law enforcement to be a user of a device found at the premises, to the fingerprint scanner of the device; (2) hold a device found at the premises in front of the face those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.